UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

                            Plaintiff,                    **MEMORANDUM AND ORDER**

            -against-                                     04-CV-4237 (SLT) (MDG)

NEW YORK CITY TRANSIT AUTHORITY,

                            Defendant.
------------------------------------------------------------x
**TOWNES, United States District Judge:**

The United States Department of Justice brings this action on behalf of the United States

pursuant to section 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e-6, alleging that the Metropolitan Transportation Authority ("MTA") and the New York

City Transit Authority ("the TA") pursued and are pursuing policies or practices that discriminate

against employees whose religious beliefs require them to wear certain headwear, such as turbans

and khimars, unsullied by any logos.[1] The TA now moves for summary judgment on behalf of

both defendants.[2] For the reasons set forth below, defendants' motion is denied in its entirety.

## *BACKGROUND*

The TA is the country's largest mass transit agency, employing about 45,000 people,

including approximately 10,000 bus operators and 3,000 train operators (Defendants' Local Civil

Rule 56.1 Statement ["Def. 56.1"] at ¶ 1; Plaintiff United States' Responsive Statement of

---

[1] A "khimar" is a headscarf worn by observant Muslim women. *See* http://dictionary.
reference.com/browse/khimar.

[2] Although the MTA was dismissed from this action without prejudice in October 2008,
the notice of motion states that the MTA joins the TA's motion for summary judgment "on a *pro
forma* basis" and refers to the movant as "Defendants." To avoid confusion, this Court will also
refer to the movant as "defendants."

Material Facts ["Pl. 56.1"] at ¶ 1). Although the record does not contain a breakdown of the racial, ethnic or religious composition of this workforce, it is uncontroverted that the workforce has "extraordinary racial, ethnic and religious diversity" (*Id.*).

At all times relevant to this action, the TA has had formal uniform policies, which dictate what certain TA employees – including bus operators, subway train operators and conductors, and subway station agents – can wear when working in passenger service (Def. 56.1 at ¶ 2; Pl. 56.1 at ¶ 2). Separate uniform policies are promulgated by the various divisions within the TA, and are typically communicated to the relevant employees in the form of short memoranda entitled "bulletins." The uniform policies for bus operators, for example, are set forth in bulletins issued by the Department of Buses' Chief Transportation Officer (*See, e.g.*, Declaration of Richard Schoolman, Esq., in Support of Defendants' Motion to Dismiss ["Schoolman Dec."], Exs. 14(a), (c) & (d); Plaintiff United States' Exhibits to its Responsive Statement of Materials Facts ["Pl. Exs"], 13-17). Similarly, the uniform policies for subway train operators and conductors are set forth in bulletins issued by the Chief Transportation Officer of Rapid Transit Operations ("RTO") (*see, e.g.*, Schoolman Dec. Ex. 15 and Pl. Exs. 19-23), and the uniform policies for station agents are set forth in bulletins issued by the Chief Station Officer of the Division of Station Operations (*see, e.g.*, Pl. Exs. 24-27).

The parties have, between them, provided the Court with many – although not all – of the bulletins issued by the Department of Buses' Chief Transportation Officer, K. Jennifer Sinclair, between October 1998 and October 2005 (*See* Schoolman Dec., Exs. 14(a), (c) & (d); Pl. Exs. 13-17). The earliest of these – Bulletin Order No. 98B-69, dated October 8, 1998 – states that between the period from October 15, 1998, to April 29, 1999, bus operators were required to

2

wear their winter uniforms, consisting of a "[d]epot logo cap, light blue shirt, maroon clip on tie or tab bow-tie, bi-swing jacket, gray trousers, commando sweater, cardigan sweater vest and vestee" (Schoolman Dec., Ex. 14(a), p. 1).[3] However, the bulletin implies that the "depot logo cap" was optional, stating, "[w]hile wearing depot logo caps, *or no hat at all*, the badge must be displayed on the right shoulder of the outermost garment worn" (*Id.*). Although the bulletin specifically prohibits drivers from wearing coats and sweatshirts "while operating in customer service," and specifically prohibits drivers from wearing canvas and high-heeled shoes while on duty, the bulletin is silent with regard to religious headwear (*Id.*).

An April 1999 bulletin issued by Chief Transportation Officer Sinclair expressly stated, rather than merely implied, that the depot logo caps were optional, and prohibited the wearing of other forms of headgear. Specifically, Bulletin Order No. 99B-32, dated April 22, 1999 – which stated that bus operators were permitted to wear their summer uniforms and listed, in separate paragraphs, the items of clothing comprising the summer uniform – contained the following entry with respect to headwear:

> **Depot logo caps are optional.** Depot logo caps are only permitted to be worn with the bill of the cap facing forward. No unauthorized caps, hats, etc. are to be worn.

(Schoolman Dec. Ex. 14(a), p. 3 [emphasis in original]). That bulletin warned that bus drivers would "not be considered ready for duty unless they are fully attired in the complete and proper uniform," and directed, "Assistant General Managers shall ensure that General Superintendents monitor for and enforce compliance with this bulletin" (*Id.*).

---

[3]Page numbers refer to the handwritten numbers on the bottom of the pages comprising Ex. 14(a).

With the exception of the warning to the bus drivers, the above-quoted language also appeared in a bulletin dated April 28, 2000 (*See* Schoolman Dec., Ex. 14(a), at 3-4). That warning re-appeared in bulletins dated September 10, 2001; April 18, 2002; and September 13, 2002, but those bulletins omitted the language expressly prohibiting "unauthorized caps, hats, etc." (*Id.*, at 5-10; Exhibit 13 to Plaintiff's Exhibits to its Responsive Statement of Material Facts ["Pl. Ex."]). In those three bulletins, the paragraph relating to headwear read simply:

> **Depot logo caps are optional.** Depot logo caps are only permitted to be worn with the bill of the cap facing forward.

(*Id.*).

At her deposition, Chief Transportation Officer Sinclair testified that this change in the language was not intended to communicate a change in policy. According to Sinclair, who authored all of the bulletins described above, the policy in September 2002 was that bus operators had the choice of wearing depot logo caps or nothing at all on their heads (Deposition of Jennifer Sinclair, dated Jan. 21, 2004 [Schoolman Dec., Ex. 23(a)], at 81-82, 83, 87). However, as Sinclair conceded, there was nothing in the bulletins specifically relating to religious headwear (*Id.* at 83).

Following the terrorist attack on the World Trade Center on September 11, 2001, some TA employees, including bus operators, reportedly began wearing FDNY and NYPD hats to reflect their solidarity with the emergency responders lost in the attack (Def. 56.1 at ¶ 14; Pl. 56.1 at ¶ 14). Although the TA believed that this headwear ran afoul of its dress code, it is undisputed that the TA took no action to enforce its headwear policy until at least March 2002. *Id.* The parties disagree about what happened after this six-month period, however. Defendants – relying

4

on the declaration of David Hyland, the Senior Director of the TA's Office of Labor Relations for the period between September 2001 and January 2008 – claim that, sometime in the first half of 2002, the Department of Buses "determined it was appropriate to seek full enforcement of the uniform policy for bus operators while in passenger service" and "determined that it would require across-the-board, neutral enforcement with respect to all unauthorized headwear" (Declaration of David Hyland, dated Jan. 10, 2008 ["Hyland Dec."] at ¶ 13). Hyland states that as a result of this across-the-board, neutral enforcement, all bus operators, "including those . . . who may have been allowed to deviate from the policy before," were required to comply with the policy (*Id.*).

Plaintiff, on the other hand, contends that, beginning in March 2002, the TA began to enforce its uniform policies selectively against Muslim bus operators who wore khimars in passenger service. Def. 56.1 at ¶ 14. In support of that proposition, plaintiff relies on a deposition from a Muslim bus driver, Malikah Alkebulan, who testified that she was repeatedly told to remove her khimar in March 2002, and on the depositions of various TA supervisors who testified that they were not aware of a broad effort to strengthen enforcement of the headwear policy (*See* Depositions listed in Pl. 56.1, n. 35).

Despite this dispute regarding what motivated the change in policy, the parties agree that Muslim bus operators who had been permitted to wear their khimars while working in passenger service prior to 2002 were no longer permitted to do so (Def. 56.1 at ¶ 16; Pl. 56.1 at ¶ 16). Alkebulan and three other female, Muslim bus operators – Stephanie Lewis, Deirdre Small, and Gladys Muhammad (a/k/a Gladys Wilson) – refused to remove their khimars or to cover them completely with depot logo caps. Accordingly, these four women were removed from passenger

service and reassigned to non-passenger service positions as "shifters" (Def. 56.1 at ¶ 17; Pl. 56.1 at ¶ 17). As "shifters," the women drove empty buses from one part of a depot to another and, occasionally, from depot to depot or from a depot to an outside maintenance facility (Hyland Dec. at ¶ 14(a)). Because they had no contact with passengers, they did not need to comply with the uniform policies and could wear whatever they wanted (*Id.*).

The parties dispute whether the "shifter" position has advantages over the ordinary bus operator position. According to defendants, the women received "the same basic hourly rate of pay" that they would have received as regular bus operators, plus a "shifter's differential" which, in early 2003, amounted to an additional 50 cents per hour (*Id.*). In addition, defendants claim that the women enjoyed better working conditions because "they did not have to deal with disruptive or rowdy or criminal passengers, they did not have to deal with as much stress-inducing traffic . . ., they had more 'down time' than passenger service bus operators; they were closer to break rooms and bathrooms; and they lost nothing with respect to future promotions in the Department of Buses or elsewhere in the TA" (*Id.*). Defendants further note that prior to the women's reassignment, all shifter positions were occupied by bus operators with more seniority than any of the women (*Id.*).

In contrast, the women themselves claimed that the shifter positions have significant disadvantages. For example, the women complained that they were no longer able to use their seniority to pick the routes and hours they wanted (Declaration of Malikah Alkebulan ["Alkebulan Dec."] [Pl. Ex. 1] at ¶ 56; Declaration of Stephanie Lewis ["Lewis Dec."][ Pl. Ex. 9] at ¶ 26; Declaration of Deirdre Small ["Small Dec."] [Pl. Ex. 12] at ¶ 30). Lewis, who had 13 years seniority as of 2003, claimed that she "regularly picked routes with built in overtime" – that

is, routes that guaranteed 9- or 10-hour days (Lewis Dec. at ¶26). Similarly, Small, who began working for the TA in 1998 (Small Dec. at ¶1), stated that she "occasionally worked runs with built in overtime" (*Id.* at ¶30).

The women also contested defendants' claim that shifters enjoyed better working conditions. Alkebulan, Lewis and Small all asserted that the shifter positions were "more stressful, hectic and unpredictable" because they "no longer had set or regular duties and did not know what [they] would be doing day-to-day" (Alkebulan Dec. at ¶58; Lewis Dec. at ¶27; Small Dec. at ¶29). At least two of the women stated that they were required to perform janitorial work, such washing buses (Alkebulan Dec. at ¶57) and washing windows (Lewis Dec. at ¶28). In addition, Alkebulan, Lewis and Small all characterized bus depots as "dangerous" workplaces, "full of noxious fumes" (Alkebulan Dec. at ¶57; Lewis Dec. at ¶33; Small Dec. at ¶28). Small stated that the fumes irritated her sinuses and gave her headaches (Small Dec. at ¶28), and Lewis testified that she had suffered serious injury to her head and back in October 2003 when she fell over a hose (Lewis Dec. at ¶33).

In the Fall of 2002, the Transport Workers Union filed a grievance on Alkebulan's behalf, challenging the TA's policy prohibiting bus operators from wearing khimars unless they were covered with TA caps (Alkebulan Dec. at ¶33). Shortly thereafter, the union filed a grievance on behalf of Lewis and Small (*Id.*; *see* Lewis Dec. at ¶33; Small Dec. at ¶28). In April 2003 – while these grievances were still pending before an arbitrator – the Department of Buses revised its uniform policy by issuing a bulletin which provided:

> If an operator elects to wear any form of headwear, NYCT issued
> uniform hats, such as the depot logo caps, shall be worn (with the
> bill of the cap facing forward).

(Schoolman Dec. Ex. 14(a); Pl. Ex. 14).

7

In May 2003, Alkebulan and Small – jointly represented by Armani B. Scott and Lonnie Hart – commenced a Title VII action against the TA: *Small v. New York City Transit Auth.*, Docket No. 03-CV-2139 (SLT). Although that action alleged religious discrimination, it also alleged gender discrimination, claiming that Muslim men were permitted to wear their kufis on duty without having any disciplinary action taken against them (*See Small* Complaint, ¶62).[4] The complaint sought a declaratory judgment, compensation for the two women, and injunctive relief. (*Id.* at 15).

In September 2003, an arbitrator ruled on the grievances (Pl. Ex. 45). In an eight-page opinion, the arbitrator found that the TA had "fulfilled its duty of reasonable accommodation" by reassigning the women to shifting positions (*Id.* at 5). However, the arbitrator also found that, prior to the April 2003 bulletin, the Department of Buses had no rule prohibiting bus operators from wearing khimars in passenger service (*Id.* at 6). The arbitrator further found that the TA had not uniformly enforced the headwear policies set forth in the April 2003 bulletin, stating, "The uncontradicted evidence reveals that Muslim men, while operating buses in passenger service, are permitted to wear Kufis and Fezes without wearing an Authority issued hat" (*Id.* at 6-7).[5]

On November 17, 2003, less than two months after the arbitrator issued his opinion, the Department of Buses issued a "Permanent Bulletin" aimed at addressing the lack of uniform enforcement (Pl. Ex. 15). That bulletin summarized the arbitrator's opinion and emphasized the

---

[4]A "kufi" is a close-fitting, brimless, cylindrical or round hat. *See* http://merriam-webster.com/dictionary.

[5]A "fez" is a brimless cone-shaped flat-crowned hat. *See* http://merriam-webster.com/dictionary.

"need to remove the possibility of any challenge based on lax enforcement" by ensuring that the uniform policies were "consistently enforced across-the-board" (*Id.* at 1). The bulletin then reiterated the headwear policy as enunciated in the April 2003 bulletin and repeated in a subsequent bulletin dated September 23, 2003 (*see* Schoolman Dec., Ex. 14(a), at 13-14), before setting forth detailed procedures for dealing with violators (Pl. Ex. 15 at 2-3).

Under those procedures, violators who alleged that they were wearing unauthorized headwear for religious reasons were to be directed to wear a depot logo cap over the headwear while in passenger service (*Id.* at 2). Those who refused to do so on religious grounds were to be sent immediately to the "Depot AGM," who was to ask about the basis for the refusal to comply (*Id.* at 3). If the basis appeared to be a "bona fide religious belief," the Depot AGM was to give the employee seven days in which to obtain "documentation" from his or her religious organization attesting to the religious conflict (*Id.*). The "sufficiency" of documentation was then to be "determined after review with [the TA's Office of] Labor Relations" (*Id.*). If the documentation was determined to be sufficient, the employee would be "accommodated by providing a budgeted shifting/drilling position, if one is available at the time" (*Id.*). If no such position was available, the AGM was to contact the Office of Labor Relations for Guidance (*Id.*).

In June 2004, Lewis and Muhammad filed separate Title VII actions against the TA. Muhammad's action – *Muhammad v. New York City Transit Auth.*, Docket No. 04-CV-2294 (SLT) – was brought by the same attorneys who represented Alkebulan and Small. Accordingly, Muhammad's complaint, like the one filed in *Small*, alleged both religious and gender discrimination and specifically claimed that male, Muslim employees were being allowed to wear their kufis on the job. *Muhammad* Complaint at ¶55. However, Muhammad's complaint

also incorporated distinct disparate treatment, disparate impact and hostile work environment causes of action that were not alleged in *Small* (*See id.* at ¶¶78-98).

Lewis's action – *Lewis v. New York City Transit Auth.*, Docket No. 04-CV-2331 (SLT) – was brought by another attorney, Omar T. Mohammedi. Although Lewis's complaint alleged gender discrimination, it focused primarily on the allegations of religious discrimination. The complaint in that action characterized Lewis's reassignment to the shifting position as a demotion (*Lewis* Complaint at ¶¶60-63), and alleged a cause of action for failure to offer Lewis a religious accommodation in violation of Section 701(j) of Title VII (*id.* at ¶¶ 64-66). The complaint specifically alleged that Lewis had proposed wearing a khimar "with the same material and color as the MTA uniform with the logo on top," but that the TA had rejected that proposal (*Id.* at ¶34).

### The Complaint in this Action

On September 30, 2004, the United States Department of Justice commenced this action. The Government claimed that Defendants had pursued, and were still pursuing, "policies and practices that discriminate against employees on the basis of religion, in violation of Section 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-6" by "(A) [s]electively enforcing uniform policies and taking adverse employment actions against Muslim, Sikh and similarly situated employees who are unable to comply with uniform policies for religious reasons; (B) [f]ailing or refusing to reasonably accommodate Muslim, Sikh and similarly situated employees who, in accordance with their religious beliefs and practices, are unable to comply with uniform policies; and (C) [f]ailing or refusing to take appropriate action to eliminate the discriminatory policies and practices and to remedy the effects of those policies and

practices" (Complaint at ¶15). In support of this claim, the Government alleged that, prior to 2002, Defendants had failed or refused to enforce uniform policies for bus and subway train operators, and had condoned the wearing of non-TA hats in some instances. The Government further alleged that, since March 2002, Defendants had "selectively enforced uniform policies to target Muslim and Sikh employees whose sincerely held religious beliefs and practices require that they wear religious head coverings," resulting in "adverse employment actions" against "Muslim, Sikh and similarly situated employees" (*Id.* at ¶8).

By way of example, the Government specifically alleged that Alkebulan, Lewis, Muhammad and Small – along with a Sikh subway train operator, Kevin Harrington – had been involuntarily transferred to shifter positions as a result of their refusal to comply with uniform policies that conflicted with their sincerely held religious beliefs, and had "no passenger interaction and diminished benefits" as a result (*Id.* at ¶¶10-14). However, the complaint did not imply that the action was brought on behalf of these individuals – four of whom had already filed their own actions – or solely on behalf of bus and subway train operators. To the contrary, the only relief requested was an injunction prohibiting Defendants from "engaging in discriminatory employment policies and practices against Muslim, Sikh and similarly situated employees based on religion . . ." (*Id.* at 4).

***Post-Complaint Developments***

One week after this action was filed and exactly four months after Lewis filed her complaint, the Department of Buses again changed its uniform policy, essentially adopting Lewis's proposal. In an Updated Permanent Bulletin dated October 7, 2004, the Department of Buses promulgated the following headwear policy for bus operators in "customer service":

If an operator elects to wear any form of headwear, NYCT issued
uniform hats, or other specified NYCT-issued or NYCT-approved
headwear, shall be worn. The uniform hat (sometimes referred to
as the depot logo cap), if worn, shall be worn with the bill of the
cap facing forward. Alternatively, an operator may also wear a
turban made of NYCT-provided blue cotton fabric with an
assigned logo affixed to the front, in the center; a headscarf or
khimar made of NYCT-provided blue cotton fabric with an
assigned logo affixed to the front, in the center; or a tam (made of a
NYCT-approved blue fabric to be supplied by the operator) with an
assigned logo affixed to the front, in the center.

Bus Operators who, for any reason, wish to wear some other type
of headwear may do so provided it fits completely under the
uniform cap or other NYCT-approved forms of headwear
discussed above, and is not visible.

(Schoolman Dec. 14(c) at 1; Pl. Ex. 17 at 1).

The bulletin went on to state that unauthorized headwear that could not be completely

covered "must be removed unless the employee has been given an accommodation" (*Id.* at 2).

The bulletin alluded to "accommodation procedures" that were to be followed if an employee

requested a religious accommodation, and stated that an employee had to comply with those

procedures within ten days to avoid charges of being out of uniform (*Id.*). While it seems likely

that the "accommodation procedures" were those procedures set forth in the Permanent Bulletin

dated November 17, 2003, the Updated Permanent Bulletin did not mention the prior Permanent

Bulletin or specify the accommodation procedures.

Within a week after the Department of Buses issued its Updated Permanent Bulletin, both

the Chief Transportation Officer of RTO and the Chief Station Officer issued bulletins adopting

similar headwear policies for subway train personnel and station agents, respectively. On

November 10, 2004, the RTO's Chief Transportation Officer issued a one-page bulletin entitled,

"Expansion of Headwear Options for Uniformed Personnel," which advised RTO employees that

"uniform options" had been "expanded to include NYCT approved headwear, in uniform color,

that can be worn as turbans or headscarves/khimars" (Pl. Ex. 20). The bulletin then promulgated

a headwear policy which was identical to the Department of Buses' in all respects, except that it

referred to "uniformed employees," rather than "bus operators," and omitted the reference to the

depot logo caps (*Id.*). The bulletin ordered Line Managers and Train Service Supervisors to

"monitor this directive for strict compliance" (*id.*), but did not prescribe consequences for non-

compliance or mention any accommodation procedure.

On November 15, 2004, the Chief Station Officer issued a one-page bulletin entitled,

"Expansion of Uniform Headwear Options," advising Division of Station Operations employees

that "uniform options" had been "expanded to include garments in uniform color that can be

worn as turbans or khimars and can be used as substitutes for the TA issued cap" (Pl. Ex. 25).

The bulletin then described the garments, noting, *inter alia*, that the khimar would come with an

MTA logo affixed to it, but that turban- and tam-wearers would have to affix the logo to the

garment themselves (*Id.*). The bulletin further provided:

> Station personnel who, for any reason, wish to wear some other
> type of headwear may do so provided it fits completely under the
> uniform cap, or other NYCT-approved forms of headwear
> discussed above, and is not visible.

(*Id.*). Like the RTO bulletin, the Chief Station Officer's bulletin ordered "Managers and

Supervisors . . . [to] monitor this directive for strict compliance," but did not prescribe

consequences for non-compliance or mention any accommodation procedure (*Id.*).

Four and one-half months later, the Chief Station Officer restated the Division of Station

Operations' headwear policy in terms which were nearly identical to those used by the

Department of Buses and RTO. In a March 29, 2005, bulletin entitled "Uniform Dress Code,"

the Chief Station Officer stated:

> Only NYCT issued uniform hats, or other specified NYCT-issued
> or NYCT-approved headwear, shall be worn. The uniformed [*sic*]
> hat shall be worn with the bill of the cap facing forward.
> Alternatively, a uniformed employee may wear a turban made of
> NYCT-provided blue cotton fabric with an assigned logo affixed to
> the front, in the center[; a] headscarf or khimar made of NYCT-
> provided blue cotton fabric with an assigned logo affixed to the
> front, in the center; or a tam (made of a NYCT-approved blue
> fabric to be supplied by the operator) with an assigned logo affixed
> to the front, in the center[.]
>
> Uniformed employees who, for any reason, wish to wear some
> other type of headwear may do so provided it fits completely under
> the uniform hat or other NYCT-approved forms of headwear
> discussed above, and is not visible.

(Pl. Ex. 26 at 3). In a subsequent bulletin, dated August 8, 2005, the Chief Station Officer

clarified that all approved headwear had to be worn with "the assigned logo or badge (as

appropriate affixed to and centered in the front of the headwear" (Pl. Ex. 27).

### The Actions by Male Sikh Employees

On July 15, 2005, Kevin Harrington, a Sikh subway train operator who had been

employed by the TA for over 20 years, commenced his own Title VII action against the TA:

*Harrington v. Reuter*, Docket No. 05-CV-3341 (SLT). In his complaint, Harrington alleged that

the TA had voiced no objections to his wearing a turban in passenger service until June 2004,

when a TA official gave him the choice of removing his turban or being reassigned to "a position

outside the public view" (*Harrington* Complaint at ¶¶17-19). When Harrington refused to

14

remove his turban and requested an accommodation, he was removed from passenger service and reassigned to the "yard" (*Id.* at ¶21; Def. 56.1 at ¶ 21; Pl. 56.1 at ¶ 21). A few days later, Harrington was returned to his passenger-service position (*Harrington* Complaint at ¶21). However, TA President Reuter subsequently wrote a letter to the president of Harrington's union "warning . . . Harrington and others with seniority who were not able to wear uniform hats because of religious reasons to choose yard jobs out of public view in the forthcoming selection process" (*Id.* at ¶22).

Harrington ignored Reuter's warning and selected a job in passenger service (*Id.* at ¶23). The TA initially permitted him to continue working in that capacity but, in October 2004, demanded that he place a logo on his turban (*Id.* at ¶25). Harrington protested that this requirement was "in direct conflict with his religious beliefs and practices" (*id.* at ¶26), but ultimately agreed to wear the logo "to avoid an involuntary transfer" (*Id.* at ¶28). In March 2005, he filed a charge of discrimination with the EEOC and, less than two months after receiving a right-to-sue notice, commenced his action (*Id.* at ¶9). The action primarily alleged that the TA had failed to accommodate his religious beliefs, but also included disparate treatment, disparate impact, and retaliation claims.

On June 27, 2005, the same attorney who had filed suit on Harrington's behalf wrote to the TA's attorney, Richard Schoolman, on behalf of five Sikh station agents who viewed the Uniform Dress Code set forth in the Chief Station Agent's March 29, 2005, bulletin to be "an unlawful infringement upon their rights under federal state and local anti-discrimination laws" (Letter to Richard Schoolman, Esq., from Ravinder S. Bhalla, Esq., dated June 27, 2005 [Schoolman Dec., Ex. 17(a)] at 1). In that letter, the attorney – Ravinder S. Bhalla, Esq. – stated

15

that his clients, who had been wearing their turbans at work for years without incident, believed

that the "new MTA logo requirement . . . intrude[d] upon a sacredly held space and an article of

their religious faith" (*Id.* at 2). In addition, Mr. Bhalla noted that his clients had been having

practical problems with the NYCT-provided fabric, which they claimed could not be "worn

properly" because it was "the wrong size" and "of poor quality" (*Id.*). Mr. Bhalla invited the TA

to "enter into a dialogue in order to attempt to resolve any conflict between [the employees']

religious mandates and [the TA's] work requirements," and expressed the hope that the conflict

could be "resolved amicably" (*Id.*).

In the week between July 8 and 15, 2005, Messrs. Bhalla and Schoolman exchanged

letters in an attempt to resolve the dispute (*See* Schoolman Dec. at ¶ 9, Exs. 17(a)-(c)). In that

correspondence, Mr. Schoolman noted that one of Mr. Bhalla's clients – Brijinder S. Gill – had

retired on July 2, 2005 (Letter to Ravinder S. Bhalla, Esq., from Richard Schoolman, Esq., dated

July 8, 2005 [Schoolman Dec., Ex. 17(b)] at 1), and that the remaining four clients were either

complying with, or prepared to comply with, the Uniform Dress Code by wearing "appropriate

blue turbans with logo patches on the front" (Letter to Ravinder S. Bhalla, Esq., from Richard

Schoolman, Esq., dated July 15, 2005 [Schoolman Dec., Ex. 17(c)] at 1). However, Mr.

Schoolman alluded to a conversation in which Mr. Bhalla informed him that the four clients did

not want to wear the logo patches on their turbans and were still seeking an exemption from the

logo requirement on religious grounds (*Id.* at 1). Mr. Schoolman stated that the Division of

Station Operations was "not prepared" to grant such an exemption (*id.*), and that there were "no

available assignments for Station Agents in settings where the headwear portion of the uniform

policy . . . would not apply" (*id.* at 2). Mr. Schoolman added:

16

> If your clients are interested in other Transit Authority positions,
> that is, positions that do not have headwear requirements similar to
> those applicable now to Station Agents, I can tell you there are
> some such positions, although most are subject to civil service,
> labor union, and other administrative limitations on how they may
> be filled (and, of course, have minimum qualifications that have to
> be met). If your clients wish to explore such other positions, we
> could discuss these other positions and how they could be applied
> for.

(*Id.* at 2).

The station agents elected to keep their positions and to wear the logo on their turbans,

albeit "under protest" (Def. 56.1 at ¶36; Pl. 56.1 at ¶36). Thereafter, in November 2005, the five

station agents (hereinafter, the "Five Station Agents") jointly commenced a Title VII action:

*Singh v. New York City Transit Auth.*, Docket No. 05-CV-5477 (SLT). In that action, the Five

Station Agents alleged largely the same causes of action that Mr. Bhalla had raised in the

*Harrington* Complaint: failure to accommodate, disparate impact and disparate treatment under

both federal and New York State law. However, the *Singh* Complaint, unlike the complaint in

*Harrington*, did not allege harassment or retaliation.

### Defendants' Motions

Defendants now move for summary judgment on the complaint in this action.[6] Although

Defendants' Memorandum of Law in Support of their Motion ("Defendants' Memo") groups the

arguments into three points, each point incorporates several arguments. Defendants' first point –

that this case cannot be maintained as a "pattern or practice" action – encapsulates two separate

arguments. First, citing to *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 160 (2d Cir. 1991),

---

[6]At or about the same time, Defendants moved for summary judgment in the five
individual Title VII actions mentioned above. However, Defendants subsequently agreed to
withdraw those motions pending the outcome of this motion.

defendants argue that because "pattern or practice" actions must involve intentional discrimination, only "disparate treatment" claims can be raised in an action pursuant to section 707 and "[t]he DOJ has no legal basis to proceed on a 'pattern or practice' theory based on a non-disparate treatment 'reasonable accommodation' claim" (Defendants' Memo at 18). Second, defendants argue that because the government has so far identified only ten alleged victims of the discrimination, there is no evidence that the discrimination was widespread enough to be characterized as the TA's "standard operating procedure" (*Id.* at 19).

In their second point, defendants argue that plaintiff's reasonable accommodation claim must be dismissed for three reasons. First, assuming that the same burden-shifting analysis applies in this case as applies to individual Title VII actions, defendants assert that plaintiff cannot establish a prima facie case because plaintiff cannot show that any of the five employees named in the complaint in this action or the Five Station Agents (collectively, the "Ten Employees") were disciplined for failure to comply with the headwear policies. Second, defendants argue that, assuming plaintiff can make out a prima facie case, defendants have, as a matter of law, provided the Ten Employees with a reasonable accommodation. Third, defendants argue that, even if defendants failed to offer a reasonable accommodation, there is no reasonable accommodation which would not cause defendants undue hardship.

In their third point, defendants request that plaintiff's "intentional discrimination (disparate treatment) claim" be dismissed for three reasons. Again assuming that the same burden-shifting analysis applies to this case as applies to individual Title VII actions, defendants first argue that plaintiff has not made out a prima facie case of disparate treatment with regard to any of the Ten Employees because (1) none of the employees suffered an adverse employment

action and (2) plaintiff's evidence does not support an inference of intentional religious discrimination. Defendants next assert that they have offered legitimate non-discriminatory reasons for their allegedly discriminatory actions. Finally, defendants anticipate and address the arguments that plaintiff might advance in attempting to show that defendants' non-discriminatory reasons are pretextual.

## *DISCUSSION*

### *I. Standard of Review*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotation marks omitted).

The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the disputed facts

must be material to the issue in the case, in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (internal quotation marks omitted) (alteration in original).

## II. The Parties' Burdens in Section 707 Cases

Before addressing the merits of defendants' arguments, this Court must first dispel any confusion that might exist regarding the nature of this case and the manner in which this case should be analyzed. For example, while defendants correctly "assume" that this is a "pattern or practice action under Title VII (42 U.S.C. §2000e-6), Defendants' Memo at 17, defendants read the complaint as alleging a pattern or practice of unlawful discrimination against bus and train operators and others engaged in transporting passengers. *Id.* at 29. Accordingly, defendants contend that the claims of the Five Station Agents are not properly part of this case. *Id.* In addition, defendants assume that *McDonnell-Douglas* burden-shifting analysis, applicable to individual Title VII actions, will also apply in this case.

Section 707 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-6, allows the federal government, . . . through the Attorney General of the United States, to bring a civil action directly against an employer charging systematic discrimination against a protected group." 1 Lex K. Larson, *Employment Discrimination* §8.01[3], at 8-11 (Matthew Bender 2d ed. 2010). Specifically, section 707 provides that the Attorney General may bring a federal action "[w]henever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by [Title VII], and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights . . . described [Title VII] . . . ." As used in this statute, "pattern or practice" is not a term of art. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 n. 16 (1977). Rather, "the words reflect only their usual meaning," *id.*, and were intended to convey "[t]he point . . . that single, insignificant acts of discrimination by a single business would not justify a finding of a pattern or practice . . . ." *Id.* (quoting Sen. Hubert Humphrey's statements in 110 Cong.Rec. 14270 (1964)).

"Generally, a pattern-or-practice suit is divided into two phases: liability and remedial." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001). During this initial liability phase, the Government bears the initial burden of "demonstrat[ing] that unlawful discrimination has been a regular procedure or policy followed by an employer." *Teamsters*, 431 U.S. at 360. The Government must show that such "discrimination was the company's standard operating procedure," rather than merely "isolated or 'accidental' or sporadic." *Id.* at 336. At this initial stage, "the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy," but is required only "to establish a prima facie case that such a policy existed." *Id.* at 360.

21

To meet this initial burden, "[p]laintiffs have typically depended upon two kinds of circumstantial evidence to establish the existence of a policy, pattern, or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination." *Robinson*, 267 F.3d at 158 (quoting 1 Lex K. Larson, *Employment Discrimination*, at §9.03[1]). "There is no doubt that '[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination' . . . ." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501 (1989) (quoting *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307-308 (1977)). Moreover, "when there is a small number of employees, anecdotal evidence alone can suffice." *United States v. City of New York*, 631 F. Supp. 2d 419, 425 (S.D.N.Y. 2009) (quoting *Sidor v. Reno*, No. 95 Civ. 9588 (KMW), 1997 WL 582846, at *10 (S.D.N.Y. 1997)). Statistics "are clearly not required, especially when the sample size is too small to produce meaningful results." *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1267 (10th Cir. 1988).

If the government satisfies its initial burden, "the burden then shifts to the [defendant] employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant." *Teamsters*, 431 U.S. at 360. "If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy." *Id.* at 361. On the other hand, if the defendant employer "introduces evidence satisfying this burden . . ., the trier of fact then must consider the evidence introduced by both sides to determine whether the plaintiffs have established by a preponderance of the evidence that the defendant engaged in a pattern or practice of intentional discrimination." *Robinson*, 267 F.3d at

22

159. "Should the plaintiffs prove a pattern or practice of discrimination, the court may proceed to fashion class-wide injunctive relief." *Id.*

In this action, plaintiff alleges that "[d]efendants have pursued and continue to pursue policies and practices that discriminate against employees on the basis of religion, in violation of Section 707 of Title VII of the Civil Rights Act of 1964 . . . ." Complaint at ¶15. Plaintiff then identifies two categories of policies or practices. First, plaintiff alleges that defendants have engaged in disparate treatment of "Muslim, Sikh and similarly situated employees who are unable to comply with uniform policies for religious reasons" by "[s]electively enforcing uniform policies and taking adverse employment action against [them]." *Id.* at ¶15(A). Second, plaintiff alleges that defendants have failed to make reasonable accommodations for "Muslim, Sikh and similarly situated employees who, in accordance with their religious belief and practices, are unable to comply with uniform policies." *Id.* at ¶15(B).

Although the complaint does not specifically define the term "employees," Defendants' Memo implies that this term encompasses only bus and train operators, or those engaged in "transporting" passengers. *See, e.g.*, Defendants' Memo at 29. In support of this contention, defendants cite to paragraph 5 of the complaint, which alleges that "[d]efendants employ, *among other individuals*, bus and subway train operators, responsible for transporting individuals throughout the New York City metropolitan area." Complaint at ¶5 (emphasis added). However, this language itself expressly states that defendants employ more than just bus and train operators, and there is nothing in the complaint that implies that the term "employees" should be read as encompassing only a subset of all employees. In a Section 707 pattern-or-practice suit, the focus is "on the employment system as a whole rather than just a part of it." *United States v. Buffalo*, 457 F.Supp. 612, 620 (W.D.N.Y. 1978).

To be sure, the complaint makes specific allegations with respect to five employees, four of whom are bus operators and one of whom is a train operator. However, these allegations serve only to show examples of instances in which defendants have engaged in the alleged discriminatory policies or practices. Indeed, the complaint does not seek damages for these specific employees, but seeks only injunctive relief prohibiting the alleged selective enforcement and mandating reasonable accommodation. Accordingly, this Court does not construe the complaint as limited solely to bus and train operators or to those employees engaged in the actual transportation of passengers.

### Defendants' First Point

Defendants' first point – that this action cannot be maintained as a "pattern or practice" action – encapsulates two separate arguments. First, citing to *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 160 (2d Cir. 1991), defendants argue that because "pattern or practice" actions must involve intentional discrimination, only "disparate treatment" claims can be raised in an action pursuant to section 707. Defendants' Memo at 18. Second, defendants argue that because the government has so far identified only ten alleged victims of the discrimination, there is no evidence that the discrimination was widespread enough to be characterized as the TA's "standard operating procedure." *Id.* at 19.

With respect to the first of these arguments, this Court does not read *Lopez* as implying that "Title VII's 'pattern or practice' claims are limited to 'disparate treatment' claims." Defendants' Memo at 18. The only pattern-or-practice claim raised in *Lopez* was based on disparate treatment, not disparate impact. *See Lopez*, 930 F.2d at 160. Accordingly, the *Lopez* Court did not have occasion to hold that a pattern or practice claim could be based on theories other than disparate treatment.

24

While Section 707 requires that the pattern or practice of resistance to the full enjoyment of any of the rights secured by Title VII be "intended to deny the full exercise of the rights . . . described [Title VII]," this requirement does not limit Section 707 actions to disparate treatment claims. To the contrary, it appear to be well-settled that "[a] 'pattern or practice' of discrimination could be either a pattern of disparate treatment of a number of individuals, or the wide-scale application of tests or other neutral factors having disparate impact, or both." 1 Lex K. Larson, *Employment Discrimination*, at §8.01[3], at 8-12. Indeed, the very argument that defendants make here was expressly rejected in *United States v. City of Yonkers*, 609 F.Supp. 1281 (S.D.N.Y. 1984), a section 707 action founded "wholly on the disparate impact model of employment discrimination and attack[ing] only certain facially neutral selection criteria in the hiring of Yonkers police officers." *Id.* at 1283. Addressing Yonkers' argument that "as a matter of law disparate impact analysis cannot establish a pattern or practice of discrimination within the meaning of section 707(a)," Judge Sofaer explained:

> The argument confuses the breadth of discrimination necessary to support the Attorney General's suit with the means available to prove it. The Supreme Court has advised that in a pattern-or-practice action the government "ultimately had to prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," *Teamsters*, 431 U.S. at 336[;] "'single, insignificant, isolated acts of discrimination'" would not do, *id.* at 336 n. 16 (quoting Senator Humphrey, 110 Cong.Rec. 14270 (1964)). But as the [Supreme] Court's comparison in *Teamsters* of the disparate treatment and disparate impact analyses in the context of a section 707(a) suit suggests, *see id.* at 335 n. 15, a pattern of discrimination might be proved by either widespread disparate impact or regular disparate treatment. "Either theory may, of course, be applied to a particular set of facts." *Id.* For this reason, courts have employed disparate impact analysis in pattern-or-practice suits without comment. *See, e.g., United States v. City of Chicago*, 573 F.2d 416, 424 (7th Cir.1978) (suit by Attorney General under 42 U.S.C. 2000e *et seq.*); *Walls v. Mississippi State Department of Public Welfare*, 542 F.Supp. 281, 309-10

(N.D.Miss.1982) (government challenge under section 707 to educational qualifications and testing program utilizing disparate impact analysis), *aff'd in part, rev'd in part on other grounds,* 730 F.2d 306 (5th Cir.1984); *United States v. City of Buffalo,* 457 F.Supp. 612, 621-22 (N.D.N.Y.1978), *modified on other grounds,* 633 F.2d 643 (2d Cir.1980).

*Id.* at 1284-85.

Plaintiff's second argument focuses incorrectly on the absolute number of employees affected by the allegedly discriminatory policy. As the Second Circuit emphasized in *Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395 (2d Cir. 1981), if there is evidence of systemic discrimination, the fact that plaintiff cannot establish a large number of victims of that discrimination is of no moment. The Second Circuit stated:

> While the definition of a pattern or practice is not capable of a precise mathematical formulation, . . . more than two acts will ordinarily be required. If there were evidence that a policy of discrimination had been adopted, perhaps two or even one confirmatory act would be enough.

*Id.* at 406 (internal citations omitted). Accordingly, the fact that plaintiff has so far identified only ten "victims" of the TA's allegedly discriminatory headwear policy does not mandate dismissal.

The cases cited in footnote 70 of Defendants' Memo are not to the contrary. *Mitchell v. New York Blood Center,* No. 94 CV 5156 (NG), 1998 WL 846828 (E.D.N.Y. Oct. 1, 1998), and *In re Western Dist. Xerox Litig.,* 850 F.Supp. 1079 (W.D.N.Y.1994), both held that anecdotal evidence of a few incidents of discrimination involving a large employer, without more, is rarely sufficient to "give rise to an inference that defendant engaged in a corporate-wide pattern or practice of discrimination." *In re Western Dist. Xerox Litig.,* 850 F.Supp. at 1086 (quoted in *Mitchell,* 1998 WL 846828, at *3). Similarly, *EEOC v. Carrols Corp.,* No. 98-CV-1772, 2005

26

WL 928634 (N.D.N.Y. 2005), held that evidence that .367% of the defendants' 90,835 female employees had experienced sexual harassment was insufficient to establish a pattern or practice of sexual discrimination. *Id.* at *5. However, none of these three cases stands for the proposition that a plaintiff must establish that there have been a certain number of victims in order to make out a pattern-or-practice claim.

This Court further notes that defendants' attempt to engage in statistical analysis of the sort used by Chief Judge Scullin in *Carrols Corp.* is flawed. As plaintiff correctly notes, *see* Memorandum of Plaintiff United States in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Memo") at 18, n. 13, Judge Scullin determined what percentage *of the protected class* had been subjected to discrimination and concluded that not even "a substantial minority of Defendant's *female* employees experienced harassment." *Carrols Corp.*, 2005 WL 928634, at *5 (emphasis added). Defendants, however, have calculated what percentage of the TA's *total* workforce has been affected by the discrimination alleged herein.

### *Defendants' Second Point*

The three arguments raised in defendants' second point relate to plaintiff's claim that the TA has engaged in a pattern or practice of unlawful religious discrimination by failing to accommodate the religious practices of Muslim, Sikh and similarly situated employees as required by Title VII. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion," 42 U.S.C. § 2000e-2(a)(1), or to "limit, segregate or classify" an employee "in a way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of that employee's religion. 42 U.S.C. § 2000e-2(a)(2). The term "religion"

is defined to "include all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employers's business." 42 U.S.C. § 2000e(j). Thus, "it is 'an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees . . . .'" *Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (quoting *Trans World Airlines. Inc. v. Hardison*, 432 U.S. 63, 74 (1977)). "[A]n accommodation causes 'undue hardship' whenever that accommodation results in 'more than a *de minimis* cost' to the employer." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 67 (1986) (quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977))

In Title VII actions brought by individuals alleging that their employers failed to reasonably accommodate their religious practices, the plaintiffs' claims are analyzed under the burden-shifting framework of the sort prescribed in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this framework, plaintiffs must first make out a prima facie case by showing that "(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement." *Baker*, 445 F.3d at 546 (quoting *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir.2001)). Once a prima facie case is established, the burden shifts to the employer to show that it could not reasonably accommodate plaintiff without undue hardship. *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir.1985), *aff'd & remanded on other grounds*, 479 U.S. 60 (1986).

Defendants' arguments implicitly assume that the same burden-shifting analysis that applies in Title VII actions brought by individual employees must also apply in this § 707 action.

Focusing entirely on the Ten Employees, defendants first argue that these employees were never disciplined and, therefore, cannot make out the third prong of a prima facie case. Next, defendants argue that the accommodations offered to the ten employees were reasonable. Finally, defendants argue that, if these accommodations were not reasonable, no reasonable accommodations could be offered to these employees without creating an undue hardship on defendants.

However, the assumption underlying these arguments is incorrect. In *Teamsters*, the Supreme Court expressly rejected the argument that "the Government's burden of proof in a pattern-or-practice case must be equivalent to that outlined in *McDonnell Douglas* . . . ." *Teamsters*, 431 U.S. at 357. Noting that *McDonnell Douglas* "did not purport to create an inflexible formulation" for analyzing claims of discrimination under Title VII, the Court adapted the method of proof it used in adjudicating a class-action pattern-or-practice claim of race discrimination under Title VII in *Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976). The *Teamsters* Court then proceeded to promulgate the two-stage framework discussed above at pp. 21-23, under which the government's "initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360.

At this initial phase, the focus is on the employer's policies or practices, rather than on its actions with regard to individual employees. As the Supreme Court noted:

> [A]t the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking. While a pattern might be demonstrated by examining the discrete decisions of which it is composed, the Government's suits have more commonly involved

> proof of the expected result of a regularly followed discriminatory
> policy.

*Teamsters*, 431 U.S. at 360 n. 46. Thus, unlike in a Title VII action brought by an individual

employee, "[a]t the initial, 'liability' stage of a pattern-or-practice suit the Government is not

required to offer evidence that each person for whom it will ultimately seek relief was a victim of

the employer's discriminatory policy." *Id.* at 360.

In light of the foregoing, this Court finds no merit in Defendants' argument that this

action must be dismissed because plaintiff has not proved that any of the Ten Employees have

ever been disciplined. Plaintiff can prove a prima facie case by showing that the TA's headwear

policies, which are set forth in painstaking detail in bulletins issued by various TA officials,

discriminate on the basis of religion. *See id.* In a typical Title VII pattern-and-practice suit, "the

question of individual relief does not arise until it has been proved  that the employer has

followed an employment policy of unlawful discrimination." *Id.* at 361. Accordingly, the facts

relating to the Ten Employees will only become an issue when, and if, the government seeks

individual relief for the victims of the allegedly discriminatory policies. *See id.* at 361 ("When

the Government seeks individual relief for the victims of the discriminatory practice, a district

court must usually conduct additional proceedings after the liability phase of the trial to

determine the scope of individual relief.").

There is also no merit to the second argument raised in Defendants' second point:  that,

even assuming plaintiff could make out a prima facie case, the record establishes as a matter of

law that the TA offered a reasonable accommodation. The determination of "[w]hether or not

something constitutes a reasonable accommodation is necessarily fact-specific." *Wernick v. Fed.*

*Reserve Bank*, 91 F.3d 379, 385 (2d Cir. 1996). It typically requires a cost-benefit analysis:  an

evaluation of "the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995). "[D]eterminations on this issue must be made on a case-by-case basis, *Wernick*, 91 F.3d at 385, and "[o]rdinarily, questions of reasonableness are best left to the fact finder." *Baker*, 445 F.3d at 548 (quoting *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir.1990)).

Defendants have not persuaded this Court that this is the extraordinary case in which the reasonableness of defendants' proposed accommodations can be determined as a matter of law. "[A]n offer of accommodation may be unreasonable 'if it cause[s] [an employee] to suffer an inexplicable diminution in his employee status or benefits . . . . In other words, an accommodation might be unreasonable if it imposes a significant work-related burden on the employee without justification, such as the neutral operation of a seniority system.'" *Baker*, 445 F.3d at 548 (emphasis omitted; brackets in original) (citing *Cosme v. Henderson*, 287 F.3d 152, 160 (2d Cir. 2002)). In this case, plaintiff has adduced proof which, if credited, might establish a diminution of status and benefits. For example, plaintiff has introduced declarations from three female Muslim bus operators who testified that the TA's policies rendered them unable to use their seniority to pick the routes and hours they wanted, including routes that guaranteed overtime. *See* Alkebulan Dec. at ¶ 56; Lewis Dec.at ¶ 26; Small Dec. at ¶ 30. Two of these bus drivers either "regularly picked routes with built in overtime," Lewis Dec. at ¶26, or did so "occasionally." Small Dec. at ¶30.

Although defendants claim that "planned overtime" is available to shifters, there is nothing to suggest that the three bus operators could have worked any overtime. Defendants themselves have adduced testimony that, prior to the women's reassignment, all shifter positions were occupied by bus operators with more seniority than any of the women. Hyland Dec. at

31

¶14(a). Moreover, the women testified that they were harassed because their positions – created, in part, by "taking away from existing shifters' assignments pieces of planned overtime," *id.* – deprived other, more senior shifters of overtime. Lewis Dec. at ¶32 (harassed by co-workers commenting that she "was taking overtime away from them"); Small Dec. at ¶35 (same). While the women received a shifter's "differential," this amounted to only $4.00 per eight-hour shift in early 2003. Hyland Dec. at ¶14(a).

In addition to this evidence of a diminution of benefits, there was a genuine issue of fact regarding a diminution in status. Although shifting work might generally be viewed as desirable, as evidenced by the seniority of the shifters, at least two of the female Muslim bus operators testified that they were required to perform menial, janitorial work, such washing buses (Alkebulan Dec. at ¶57) and washing windows (Lewis Dec. at ¶28). In addition, the women stated that the bus depots were "dangerous" and "full of noxious fumes" (Alkebulan Dec. at ¶57; Lewis Dec. at ¶33; Small Dec. at ¶28). One of the women stated that the fumes irritated her sinuses and gave her headaches (Small Dec. at ¶28), while another claimed to have suffered serious injury to her head and back as a result of dangerous conditions in the workplace (Lewis Dec. at ¶33). Accordingly, while the "shifter" job may have been viewed as desirable by senior employees, there is a genuine issue of material fact concerning whether the reassignment diminished the relatively junior women's status or otherwise imposed a significant work-related burden on these employees without justification. *See Baker*, 445 F.3d at 548.

With respect to station agents, there is a genuine issue of material fact as to whether the TA offered any accommodation whatsoever. The only evidence of an accommodation is contained in a letter, sent in the course of a pre-litigation dialogue with the attorney for the Station Agent Defendants, in which the TA's attorney offered to "discuss . . . other positions and

how they could be applied for." Schoolman Dec., Ex. 17(c), at 2. Plaintiff argues that the attorney's offer was made in the course of settlement negotiations and is, therefore, inadmissible under Federal Rule of Evidence 408. Plaintiff also points out, *inter alia*, that the TA did not actually offer the Five Station Agents other positions, and that the TA's attorney's offer amounted to "a suggestion . . . that the Sikh station agents give up their jobs altogether and 'apply' through the regular civil service process for other jobs within the TA that did not require uniforms." Plaintiff's Memo at 38.

This Court is not convinced by the first of plaintiff's arguments. "Rule 408 codifies the long-standing axiom in federal courts that compromises proposed . . . are not evidence of an admission of the validity . . . of the claim or the amount of damage." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 408.03[1] (Joseph M. McLauglin ed., 2d ed. 2009) (cited with approval in *Rein v. Socialist People's Libyan Arab Jamahiriya*, 568 F.3d 345, 351-52 (2d Cir. 2009)). By its terms, Rule 408 makes evidence that a party offered to furnish "valuable consideration in . . . attempting to compromise a claim" inadmissible "to prove liability for or invalidity of the claim or its amount." Fed. R. Evid. 408. Since the TA's attorney was not offering "valuable consideration" and since the TA does not intend to offer this evidence for the proscribed purposes, Rule 408 would not preclude its admission.

However, this Court cannot find, as a matter of law, that the TA's counsel's offer was an accommodation. This case is distinguishable from *Bruff v. North Miss. Health Servs., Inc.*, 244 F.3d 495 (5th Cir. 2001) – a case on which defendants principally rely – in which the Fifth Circuit held that a medical center offered an at-will employee an accommodation by giving her "30 days, and the assistance of its in-house employment counselor, to find another position at the Center where the likelihood of encountering further conflicts with her religious beliefs would be

33

reduced." *Id.* at 501. The offer in *Bruff* implied that the hospital's human resources department would work with the plaintiff to help her find another position in the hospital. In contrast, the attorney's offer in this case was much more vague. The TA's counsel did not expressly offer the assistance of a human resources professional, but merely stated, "we could discuss . . . other positions and how they could be applied for." Schoolman Dec., Ex. 17(c) at 2. A reasonable juror could, like plaintiff's counsel herein, reasonably interpret this statement as "a suggestion . . . that the Sikh station agents give up their jobs altogether and 'apply' through the regular civil service process for other jobs within the TA that did not require uniforms." Plaintiff's Memo at 38. Interpreted in that way, the TA's counsel offer would be tantamount to no accommodation at all.

The third argument raised in defendants' second point – that, even assuming defendants have failed to offer a reasonable accommodation, no accommodation could be granted without undue hardship – is also without merit. In making this argument, defendants essentially attempt to analogize this case to *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126 (1st Cir. 2004), and other cases in which courts have found that entirely exempting employees from certain grooming and personal appearance requirements can create an undue hardship if it causes an employer to lose control of its public image. However, *Cloutier* and the cases it cites are readily distinguishable in that these cases involve instances in which an employee would not, or could not, accept any accommodation short of an outright exemption from a dress code and in which there was no question that granting such an exception would adversely affect the employer's public image.

In *Cloutier*, the plaintiff – an adherent of the Church of Body Modification – insisted in wearing facial jewelry while working as a cashier for defendant Costco, a well-known retailer.

34

The plaintiff expressly rejected compromises such as covering her facial piercings with bandages, leaving the court with the choice of either upholding or rejecting that portion of Costco's dress code which forbade all facial jewelry other than earrings. Noting that Costco had made a business determination that "facial piercings, aside from earrings, detract from the 'neat, clean professional image' that it aims to cultivate," *Cloutier*, 390 F.3d at 136, the First Circuit ruled that forcing Costco to "lose[] control over its public image . . . would constitute an undue hardship." *Id.* at 137. The Court stated:

> [W]e are faced with the . . . situation of an employee who will accept no accommodation short of an outright exemption from a neutral dress code. Granting such an exemption would be an undue hardship because it would adversely affect the employer's public image.

*Id.* at 136.

The cases discussed by the *Cloutier* Court in support of its holding can be segregated into two broad categories. First, there were cases in which the plaintiff refused to accept any accommodation short of capitulation. For example, the *Cloutier* Court cited to *Daniels v. City of Arlington*, 246 F.3d 500 (5th Cir. 2001), a case in which a former police officer challenged a police department policy that prevented him from wearing a gold cross on his uniform. Although the police department was prepared to have him wear a cross around his neck or wrist, the only accommodation the officer proposed was that he be permitted to wear the cross on his uniform. Similarly, in *Wilson v. U.S. West Communications*, 58 F.3d 1337 (8th Cir. 1995), the plaintiff claimed she had taken a religious vow to wear a graphic anti-abortion button and insisted that no alternative was reasonable.

Second, there were cases in which compromise was simply impossible. Many of those cases involved "no beards" policies and other grooming requirements which prohibited, for example, men wearing their hair below the collar. *See Fagan v. Nat'l Cash Register Co.*, 481 F.2d 1115 (D.C. Cir. 1973). By their very nature, these requirements afforded no possibility of compromise. For example, there is no middle ground between a company's requirements that employees be clean-shaven and the employees' religious beliefs prohibiting shaving.

In all of these cases, the accommodation urged by the plaintiff posed obvious hardships on the employer. In *Daniels*, for example, the Fifth Circuit found that the accommodation sought by the officer constituted "an undue hardship for the city as a matter of law," stating, "[a] police department cannot be forced to let individual officers add religious symbols to their official uniforms." *Daniels*, 246 F.3d at 506. In *Wilson*, the plaintiff conceded that her anti-abortion button "caused substantial disruption at work." *Wilson*, 58 F.3d at 1341.

With respect to the grooming cases, the *Cloutier* Court noted that grooming regulations were often held to be justified by "safety concerns." *Cloutier*, 390 F.3d at 135. As an example, the *Cloutier* Court cited to *Bhatia v. Chevron U.S.A.*, 734 F.2d 1382 (9th Cir. 1984), which held that a requirement that all machinists be clean-shaven was necessary because all machinists needed to be able to wear a respirator with a gas-tight facial seal. However, the *Cloutier* Court also cited to cases in which a grooming policy was upheld in light of the employers' legitimate business concerns that hirsute employees could cost the employer business. *Cloutier*, 390 F.3d at 136 (citing cases). The *Cloutier* Court quoted at length from the opinion in *Fagan*, in which the D.C. Circuit observed:

> Perhaps no facet of business life is more important than a
> company's place in public estimation. That the image created by its
> employees dealing with the public when on company assignment
> affects its relations is so well known that we may take judicial
> notice of an employer's proper desire to achieve favorable
> acceptance. Good grooming regulations reflect a company's policy
> in our highly competitive business environment.

*Fagan*, 481 F.2d at 1124-25. *Cloutier* also cited, *inter alia*, to *Hussien v. The Waldorf-Astoria*,

134 F. Supp. 2d 591, 599 (S.D.N.Y. 2001), for the proposition that "[s]ome courts have found

that clean-shavenness is a bona fide occupational qualification in certain businesses," and to

*Woods v. Safeway Stores, Inc.*, 420 F.Supp. 35, 43 (E.D.Va. 1976), which deferred to the

"judgment of the Safeway management tending stores in the Virginia area, that a grooming code,

maintaining an image of cleanliness, was necessary to attract and retain customers."

This case is readily distinguishable from *Cloutier* and the cases cited therein. First,

although defendants assert the Government is seeking an "exemption" from the TA's headwear

policies, Defendants' Reply Memorandum of Law ("Defendants' Reply") at 13, the Government

states that "[t]he accommodation requested by Muslim and Sikh employees was not – as the TA

claims – that they be 'exempted' from TA uniform policies." Plaintiff's Memo at 40. Rather,

the Government presents evidence that Mr. Bhalla – the attorney for Mr. Harrington and the Five

Station Agents – proposed a compromise whereby the employees would wear turbans and

khimars in the same blue color as their TA uniforms, but would affix the TA logo they were

required to place on the turban or khimar on the front pocket or collars of their uniform shirts.

Declaration of Ravinder Singh Bhalla (Pl. Ex. 6) at ¶ 8. Alternatively, Mr. Bhalla suggested that

the employees prominently display their TA photo identification cards in lieu of wearing the

logo. *Id.*

Second, this is not a case in which the uniform requirement at issue is obviously justifiable based on safety concerns or other legitimate business concerns. The only portion of the uniform policy on which the parties cannot compromise relates to the placement of the TA logo on the front of the employees' uniforms. Unlike the hard hat in *Kalsi v.New York City Transit Auth.*, 62 F. Supp. 2d 745 (E.D.N.Y. 1998) – a case frequently cited by defendants – the logo at issue was not designed to protect the wearer. Accordingly, there are no safety considerations which would justify the TA's refusal to make this accommodation.

Moreover, there is no proof that the subtle change in the placement of the TA logo would adversely affect the TA's business in any way. As the *Cloutier* Court recognized, "[t]he assessment of what constitutes an undue hardship may be somewhat different for a private employer than for [as public one]." *Cloutier*, 390 F.3d at 136 (citing *Daniels*, 246 F.3d at 503-04). The TA, which runs all of New York City's subways and most City buses, simply does not face the "highly competitive business environment" that justified upholding the grooming requirements in cases like *Fagan*, *Hussien* and *Woods*.

In this connection, the Court notes that the hardships identified by the TA are nowhere near as obvious as the hardships posed by exempting the employees of commercial businesses from grooming requirements. Defendants argue that this exemption would (1) "vitiate the TA's right . . . to present its chosen image to the public," (2) cause arbitrators not to enforce the headwear policy against non-observant employees, (3) saddle the TA with the "difficult" task of determining who to exempt, (4) imply that the TA favors certain religions, in violation of the Establishment Clause, and (5) likely lead to a loss of employee morale. Defendants' Memo at 24-26. Although defendants may be able to introduce evidence that these hardships will result,

38

that evidence comes largely from defendants' own employees or retained experts and is somewhat speculative in nature. While these employees and experts might be able to persuade a reasonable fact-finder that exempting certain Muslim and Sikh employees from the requirement that a TA logo be worn on their turbans or khimars would result in these hardships, the causal relationship between the exemption and hardships is not intuitively obvious, as it was in the grooming cases.[7]

### Defendants' Third Point

In their third point, defendants request that plaintiff's "intentional discrimination (disparate treatment) claim" be dismissed. Since defendants' second point focused on plaintiff's allegations that the TA engaged in a pattern or practice of denying reasonable accommodations to Muslim, Sikh and similarly situated employees whose religious beliefs were in conflict with the uniform policies, this Court assumes this third point focuses on the Government's claim that the TA engaged in a pattern or practice of selectively enforcing those policies against Muslim, Sikh and similarly situated employees.

All of the arguments raised in defendants' third-point are predicated on the erroneous assumption that this claim is subject to the same *McDonnell Douglas* burden-shifting analysis that applies to individual Title VII actions. Defendants first argue that plaintiff has not made out a prima facie case of disparate treatment with regard to any of the five individuals named in the

---

[7]While this Court's analysis assumes the admissibility of the testimony of defendants' expert – the industrial and organizational psychologist Thomas D. Hollmann – this analysis should not be read as a determination of plaintiff's motion *in limine* to exclude Dr. Hollmann's testimony. Since this Court need not resolve that motion in order to resolve the instant motion for summary judgment, that motion shall remain pending and will be decided only if necessary in advance of trial.

complaint or the Five Station Agents because (1) none of these employees suffered an adverse employment action and (2) plaintiff's evidence does not support an inference of intentional religious discrimination. Defendants next assert that they have offered legitimate non-discriminatory reasons for their allegedly discriminatory actions. Finally, defendants anticipate and address the arguments that plaintiff might advance in attempting to show that defendants' non-discriminatory reasons are pretextual.

However, as noted above, pp. 29-30, the *McDonnell Douglas* framework does not apply in Section 707 cases. *See Teamsters*, 431 U.S. at 357. Rather, courts use the two-step framework which the *Teamsters* Court derived from *Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976), and under which the government's "initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." *Teamsters*, 431 U.S. at 360. Although a pattern of discrimination can be demonstrated by examining discrete decisions, the Government typically relies on statistical proof to satisfy its initial burden. Indeed, in light of the enormous number of persons employed by the TA, it is unlikely that the burden could be met any other way in this case. *See In re Western Dist. Xerox Litig.*, 850 F.Supp. at 1086; *Mitchell*, 1998 WL 846828, at *3.

For these reasons, the Government does not yet have to offer evidence that the persons for whom it will ultimately seek relief were victims of the discriminatory policy. *Teamsters*, 431 U.S. at 360. Even assuming the defendants could establish that each of the Ten Employees were not victims of disparate treatment, the Government could still meet its initial burden through statistical proof. Accordingly, proof that none of the Ten Employees identified by the

Government thus far could state a prima face of case discrimination under Title VII would not mandate the dismissal of this action.

### *CONCLUSION*

For the reasons stated above, defendants' motion for summary judgment is denied.

**SO ORDERED.**

SANDRA L. TOWNES
United States District Judge

Dated: September 24, 2010
      Brooklyn, New York